# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RICKY J., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-CV-4246 |
| | ) | |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | Judge John Robert Blakey |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ricky J., a 58-year-old man with foot and lower back pain, challenges his denial of Disability Insurance Benefits and Supplemental Security Income. He argues that the Administrative Law Judge (ALJ) who decided his case erred in his evaluations of the medical opinions in the record, Plaintiff's Residual Functional Capacity (RFC), and Plaintiff's subjective complaints of pain. For the reasons discussed below, this Court finds that the ALJ's decision was supported by substantial evidence and, accordingly, affirms the denial of benefits.

## I. Background[1]

Plaintiff worked most recently in 2006 as a security guard for a commercial loading area. R. at 47–50. In that job, he made sure delivery people signed in and out, made sure no one parked in the area, and kept the area clear of refuse; Plaintiff was up and down, out of his seat constantly. *Id.* That job ended in December of 2006,

---

[1] This Court draws all facts from the Certified Administrative Record ("R."), [7-1].

when Plaintiff fell down some stairs while off duty and injured his foot. R. at 51–53. Plaintiff has not worked, or looked for work, since that time. *Id*. at 53.

On October 24, 2013, Plaintiff applied for Supplemental Security Income Benefits, alleging that he became disabled as of December 10, 2007. R. at 281–86. At that time, Plaintiff indicated that the following conditions limited his ability to work: chronic back pain, "problem with right arm"; high blood pressure; "surgery on right foot cheilectomy"; liver problems, and hepatitis C. R. at 306. Plaintiff later amended his alleged onset date to September 30, 2013. R. at 293.

The Social Security Administration denied his claim initially, R. at 189–93, and on reconsideration, R. at 197–98. Plaintiff requested a hearing before an Administrative Law Judge, R. at 201–03, and the case was assigned to ALJ Michael Hellman, who held the requested hearing on May 6, 2016, R. at 42–78.

At his hearing, Plaintiff testified that, after his foot injury in December of 2006, he did not really look for work again; he applied to one place but was told that he took too much medication. R. at 52–53. Plaintiff testified that, in addition to problems with his foot, he also has back issues. R. at 59–64. He testified that he uses a back brace and a cane, that his back is stiff and causes constant pain, and that his foot is "stiff as a board." *Id*. at 60–61. He testified that his back pain limits his ability to stand and walk: he can stand for about 10 to 15 minutes and then he has to sit down; he can walk just about half a block or maybe 10 to 15 minutes; and he can sit comfortably for no more than 30 or 40 minutes before he gets stiff. R. at 62. Plaintiff testified that he lives with his dad, but his mom comes over and cooks his meals for

the week because he does not know how to cook and also cannot cook, R. at 65; he also testified that his sister comes to the house to do his laundry because it bothers his back, *id.* He testified that, in a typical day, he gets up, eats breakfast, takes medication, maybe goes out to breakfast with his dad, goes to the grocery store, talks to his family on the phone, watches TV, and maybe visits family. R. at 66–67. Plaintiff testified that he takes numerous medications, some of which cause him to experience drowsiness, insomnia, and sometimes headaches and dizziness. *Id.* at 67. He testified that he never discussed these side effects with his doctor. R. at 69–70. Plaintiff testified that he had not received mental health treatment since May of 2013, and that, as of May 5, 2016, he no longer suffered from hepatitis C. R. at 71– 72.

At the hearing, the ALJ also heard testimony from vocational expert (VE) Gary Paul Wilhelm, who testified that Plaintiff's past work fell within skill level 3 (at the low end of semi-skilled work) and constituted light work in terms of physical demand. R. at 74. The ALJ asked the VE whether a hypothetical individual limited to light exertion demands of work (*i.e.*, can lift up to twenty pounds on occasion, lift or carry up to ten pounds frequently, and stand and walk about six hours in an eight-hour workday) and limited to simple and routine tasks, could perform the demands of Plaintiff's past work. R. at 74–75. The VE opined that he could. R. at 75. The ALJ then asked if the VE's answer would change if the hypothetical person were limited to lifting up to ten pounds occasionally, rather than frequently, and the VE opined that his answer would not change. *Id.* Finally, the ALJ asked the VE if his opinion

concerning RFC would change if the hypothetical person were more limited in terms of exertional demands, such that he could perform just sedentary work. *Id.* The VE opined that his answer would indeed change, and that a person limited to sedentary work would not be able to perform Plaintiff's past work because of the amount of walking, standing, and getting up and down. R. at 75–76.

In addition to the testimony, the ALJ also considered medical records.[2] With regard to the pre-onset date records, a December 2010 consultative physical examination indicated that Plaintiff chiefly complained of arthritis in his back, knees, arms, and legs; he also noted that he had high blood pressure but indicated that his back causes him the most trouble. R. at 404–07. Dr. Patil, who performed the examination, noted that Plaintiff was "mildly obese," but his blood pressure was normal, his vitals stable, and his examination otherwise normal. *Id.* at 407.

On January 12, 2011, Dr. David Bitzer prepared an RFC assessment based in part on Dr. Patil's examination report and found that Plaintiff could: occasionally lift or carry twenty pounds and frequently lift or carry ten pounds; stand or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. R. at 409–16. Although Plaintiff suggested further limitations, Dr. Bitzer found him only partially credible. R. at 410–14. In particular, Dr. Bitzer noted that Plaintiff ambulated using a cane that was not prescribed and demonstrated an ability to ambulate more than fifty feet without a cane; Dr. Bitzer also noted that his

---

[2] Most of the medical documentation included in the Certified Administrative Record pre-dates the date of onset.

4

complaints about his hand and grip limitations were belied by the evidence and his demonstrated use of his hands with Dr. Patil. *Id.* at 410, 414.

In 2011, Plaintiff sought treatment for foot pain due to blunt trauma after he kicked a couch. R. at 474–81. He reported pain in August and September of 2011 at a 10 out of 10 in his right foot. R. at 496, 502.

Om March 27, 2012, Plaintiff's treating physician, Dr. Lorena Monterubianesi, noted Plaintiff's hypertension, lower back pain, and GERD, as well as Plaintiff's failure to follow up with labs as to the former; Dr. Monterubianesi also noted that Plaintiff wanted more medication for his lower back pain, "but I don't have any records of this." R. at 506–511.

In May of 2012, Plaintiff was still complaining of pain from kicking the couch. R. at 525. But reports from medical exams on May 19, 2012, and June 23, 2012, noted no fracture or joint dislocation in the right foot; the reports do note "degenerative changes" in the "metatarsophalangeal joint" of the great toe, however, "with no acute findings seen." R. at 521, 525. Plaintiff had surgery March 27, 2013 to address his right foot pain. R. at 531. Post-operative examination was unremarkable. R. at 588–594. The post-operative records note the use of a surgical shoe and crutches, then a cane in April, May, and June of 2013. R. at 833, 837, 842, 847. By April 22, 2013, Plaintiff rated his pain at a 2 out of 10, R. at 595, and, by June 4, 2013, he reported no pain, just "mild stiffness" but also admitted that he did not perform prescribed range of motion exercises as often as he should, R. at 603, 852. By November, it appears Plaintiff had abandoned the cane. R. at 858. That same month, his foot pain

5

returned after his foot was "stepped on"; his doctor sent him for an X-ray (which showed no fracture) and advised him to wear wider shoes. R. at 616–17, 619. By February 2014, Plaintiff reported that he was no longer experiencing foot pain. R. at 760.

On April 24, 2013, Dr. Monterubianesi completed a physical residual functional capacity questionnaire on Plaintiff. R. at 895–98. She noted that: Plaintiff's experience of pain was severe enough to frequently interfere with the attention and concentration necessary for simple work tasks, and determined that Plaintiff: (1) could sit for just twenty minutes before needing to stand and stand for just ten minutes before needing to sit; (2) could sit about two hours in an eight-hour workday and stand/walk less than two hours in an eight-hour workday; (3) needed a job that allowed him to shift positions and allowed for unscheduled breaks every hour for ten minutes; (4) could frequently lift less than ten pounds, occasionally lift ten pounds, rarely lift twenty pounds, and never lift fifty pounds; and (5) required the use of a cane. *Id.* She noted no limitations with reaching, handling, or fingering. *Id.* at 896. Finally, she noted that Plaintiff's impairments would cause him to be absent from work more than four days per month. *Id.* at 897. Dr. Monterubianesi also attached Plaintiff's medication list, which included thirteen medications. *Id.* at 898.

In May 2013, Plaintiff underwent an adult outpatient psychiatric evaluation with Dr. Pamela Vergara-Rodriguez who noted Plaintiff's significant history of drug and alcohol dependence and referred him to self-help groups for recovery. R. at 722–27. At a follow up appointment in June 2013, Plaintiff told Dr. Vergara-Rodriguez

6

that he did not attend groups and was motivated on his own to maintain sobriety.  R. at 729–30.

Post-onset records confirm Plaintiff's back pain.  The record shows that Plaintiff began complaining of pain in his lower back in 2010.  R. at 435.  Records from 2015 indicate that Plaintiff self-reported low back pain "since 2006, insidious onset."  R. at 976.  In 2014, Dr. Monterubianesi ordered X-rays and a CT scan of the lumbar spine.  A February 1, 2014 radiology report noted "very minimal degenerative change" in the lumbar spine and "no acute abnormality."  R. at 801.  A March 11, 2014 CT scan revealed normal alignment but moderate to severe degenerative disc disease at L5-S1 with gaseous phenomena in the disc space and disk protrusions with moderate degenerative central stenoses at L4-5 and L5-S1; disc bulges were also noted at L1-2, L2-3, and L3-4, with no gross central stenosis.  R. at 748, 768, 770. The scan also revealed severe bilateral foraminal stenoses at L5-S1 and moderate bilateral stenosis at L4-5, as well as facet joint disease at L4-5 and L5-S1.  R. at 749, 768, 770, 772–73.

By March 4, 2014, Dr. Monterubianesi ordered a back brace for Plaintiff and referred him to the pain clinic.  R. at 745, 749.  Plaintiff received pain treatments throughout 2014, 2015, and 2016.  R. at 901, 909–10, 916, 927, 935, 938, 944, 957, 981–95, 1026–31, 1039–44.  In May of 2015, he reported a dull constant throbbing ache at a 10/10; he indicated that he has to "move constantly for relief" and that "pain medications help."  R. at 976.  An updated MRI performed in May of 2015 showed "degenerative disease of the lumbar and sacral spine most notable for moderate to

severe left neural foraminal narrowing at L5-S1 level resulting in encroachment if not mild compression of the exiting left L5 nerve root." R. at 979. The report notes that the findings were "similar" to the March 2014 CT scan. *Id.* As a result, his doctor created a treatment plan for lumbar facet injections, and to continue tramadol and start Lidoderm patches. R. at 982–83. Plaintiff received a lumbar facet injection in October 2015. R. at 987. By December 2015, Plaintiff had tenderness with palpation on his lower back and pain with extension and rotation of his spine, but no issues with his lower extremities or his gait and ambulation. R. at 1022. On April 7, 2016, Plaintiff underwent a radiofrequency ablation of the medial branch nerves L3, L4, L5. R. at 1035. Plaintiff tolerated the procedure well and had no complications. R. at 1036.

On February 1, 2014, Dr. Zvezdana Djuric-Bijedic completed a 45-minute consultative psychiatric evaluation of Plaintiff and diagnosed him with mood disorder secondary to medical condition; depressive disorder, not otherwise specified; and alcohol dependence, in remission. R. at 779–83. Dr. Djuric-Bijedic determined that Plaintiff, if granted benefits, could manage his own funds. *Id.* at 783.

That same day, Plaintiff had a consultation with Dr. Joseph Youkahana at the Bureau of Disability Determination Services. R. at 786–89. Dr. Youkahana listed chronic back pain stemming from a car accident as Plaintiff's chief complaint. *Id.* at 786. He also listed Plaintiff's complaints of pain in his right foot and both heels; "problems with his right hand"; high blood pressure; and liver problems." *Id.* at 786–

87.  He noted that Plaintiff walked with a cane and had a mild limping gait.  R. at 812.  He also noted Plaintiff could walk 50 feet unassisted.  *Id.*

Finally, the record includes an August 15, 2015 gastroenterology patient questionnaire, in which Plaintiff reported smoking one pack of cigarettes every two days, drinking "pints," and exercising 30 minutes a day and indicated that he was unable to work.  R. at 969.

Based upon the records and hearing testimony, ALJ Hellman denied Plaintiff's claim on June 14, 2016, R. at 24–34.  Plaintiff asked the Appeals Council to review the ALJ's decision, and the Appeals Council denied that request on April 10, 2017, making the ALJ's decision the final decision of the Commissioner.  R. at 1–6.  Plaintiff filed this action on June 6, 2017.  [1].

## II.  Legal Standards

An ALJ's findings of fact are "conclusive" as long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  The "threshold for such evidentiary sufficiency is not high"; it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Thus, after a "critical review of the evidence," *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993), courts affirm any adequately supported denial, even if reasonable minds could disagree about disability status, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008), remanding only if the decision lacks

evidentiary support or adequate discussion of the issues, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920, requiring the Commissioner to consider whether: (1) the claimant has performed any substantial gainful activity during the period for which claimant asserts disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the residual functional capacity to perform ("RFC") claimant's past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. *Id.*; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

## III. The ALJ's Decision

The ALJ employed the five-part test, finding, at steps one and two, that Plaintiff had not engaged in substantial gainful activity since the alleged onset date (September 30, 2013), and that he had the following severe impairments: degenerative disc disease (DDD) and degenerative joint disease (DJD) of the lumbar spine; post foot surgery with DJD; hepatitis C; and affective disorder. R. at 26. The ALJ also noted that Plaintiff had several non-severe impairments: obesity,

10

hypertension, and vocal cord polyp. *Id.* As to these latter impairments, the ALJ considered Plaintiff's obesity in accordance with SSR 02-02 and determined that it did not significantly affect his other body systems; he also noted that Plaintiff's hypertension was identified as controlled, and his vocal polyp was partially removed and did not otherwise impact any work-related speech issues. R. at 26–27. Plaintiff does not challenge these findings.

At step three, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. R. at 27–28. Plaintiff does not challenge this finding.

At step four, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform light work involving lifting up to 10 pounds occasionally, standing or walking for about six hours in an eight-hour workday, and sitting for six hours in an eight-hour workday; he could frequently climb ramps or stairs, balance, and stoop; occasionally climb ladders, ropes, or scaffolds; and perform simple and routine tasks with occasional interaction with supervisors. R. at 28–33. After examining the evidence and relying on the testimony of the VE, the ALJ found that Plaintiff was capable of performing his past relevant work and was thus not disabled. R. at 34. The ALJ did not consider whether Plaintiff could perform other work in the national economy.

## IV. Discussion & Analysis

Plaintiff argues that the ALJ's decision should be reversed and remanded because the ALJ erred in evaluating the medical opinions of record and in evaluating Plaintiff's RFC; he also argues that the ALJ erred in evaluating Plaintiff's subjective allegations of pain.  The Court considers his arguments below.

### A. The ALJ's Evaluation of Dr. Monterubianesi's Medical Opinion

Plaintiff first argues that the ALJ did not give an adequate explanation for why he accepted parts of Dr. Monterubianesi's RFC opinion, but not all the limitations she found in her RFC report.  [16] at 7.  The Court disagrees.

A treating physician's opinion is afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence."  20 C.F.R. §§ 404.1527(c)(2); *see also Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).[3]  If a treating physician's opinion "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent," an ALJ may properly discount it, "as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."  *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007); *see also* 20 C.F.R. §§ 404.1527(c)(2) (an ALJ "must give good reasons" for discounting a physician's opinion).  When determining the weight to give a physician's opinion, an ALJ must consider: the length, nature, and extent of the treatment relationship; frequency of examination; physician's specialty; the types of tests performed; and the consistency

---

[3]  The regulations prescribe a different standard for claims filed after March 27, 2017, see 20 C.F.R. § 404.1520c.

and support for the physician's opinion. *Larson,* 615 F.3d at 755. He must "minimally articulate" his reasons for assigning little weight to the opinion. *Henke v. Astrue,* 498 F. App'x 636, 639 (7th Cir. 2012).

Here, Plaintiff's treating physician, Dr. Monterubianesi, opined in a physical RFC questionnaire that Plaintiff suffered from lower back pain at a 7 out of 10 and had difficulty ambulating; she indicated that his pain improved in a reclining chair. R. at 895. She opined that Plaintiff could walk up to half a block, could stand/walk for less than two hours at a time, could sit for about two hours, must walk every twenty minutes for two minutes at a time, and would need unscheduled breaks every hour for ten minutes because of his muscle aches. R. at 895–96. She opined that Plaintiff could rarely lift twenty pounds, but could occasionally lift ten pounds, and frequently lift less than ten pounds; she indicated that he had no limitations in his upper extremities and could grasp, reach, twist/turn, and engage in fine motor manipulation at 100% on both left and right sides. *Id.* at 896. Finally, she opined that he would have to miss work more than four days per month. R. at 897.

The ALJ afforded some weight to Dr. Monterubianesi's assessment of Plaintiff's lifting capabilities, but little weight to the rest of her opinions. R. at 33. The ALJ need only "minimally articulate" his reasons for the weight given to Dr. Monterubianesi's opinions, and he has more than done so here. First, he found that "her findings on clinical examination and findings of other providers do not fully support the majority of the opinion she expressed." *Id.* He went on to find her opinion about Plaintiff's absence from work highly speculative and not supported by any

objective findings and pointed out that, although Plaintiff claimed to see her monthly the medical evidence documented care on a far less frequent and structured basis. R. at 30, 33. The ALJ noted that most of the medical evidence showed clinical findings of normal ambulation, that Dr. Monterubianesi had written in her own examination notes that Plaintiff was in "no distress" in March 2014, and in February 2014 found he had normal sensation and range of motion in the lower extremities. R. at 30–31. Additionally, the record showed that Plaintiff responded well to pain medications and had no issues with gait or ambulation throughout 2014 and 2105. *Id.* at 31. The ALJ also noted numerous other medical records that showed normal ambulation and managed pain. R. at 29, 31, 33. An ALJ may properly reject a treating physician's opinion that is inconsistent with substantial evidence in the record. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Elder*, 529 F.3d at 415–16. The Court finds nothing improper in the ALJ's assessment of Dr. Monterubianesi's RFC opinions.

Relatedly, the Court notes that, even if the ALJ had given Dr. Monterubianesi's findings full weight, her conclusions are not necessarily inconsistent with the ALJ's ultimate conclusion at step four: Plaintiff himself reported that in his past work he changed positions constantly, never lifted more than ten pounds, and walked no more than half a block. R. at 48–51, 57–58.

## B. The ALJ's Evaluation of the State Agency Consultants' Opinions

Plaintiff next argues that the ALJ did not provide adequate reasoning for not adopting the one and two-step limitation put forward by state agency psychologists

14

Dr. Leon Jackson and Dr. Taylor Russell. [16] at 11–13. As above, the Court finds that the ALJ minimally articulated good reasons for discounting certain aspects of these medical opinions, satisfying 20 C.F.R. §§ 404.1527(c)(2).

On February 20, 2014, Dr. R. Leon Jackson completed the medical portion of the disability determination explanation, justifying the denial of Plaintiff's application for benefits. R. at 155–62. Dr. Jackson noted that, although Plaintiff had the medically determinable impairments of spine disorders, chronic liver disease, major joint dysfunction, status post-surgery involving a weight-bearing joint, hypertension, and affective disorder, *id*. at 162, his statements about intensity, persistence, and functional limitations were not fully credible and not substantiated by the objective medical evidence alone, R. at 163–64. As to his RFC, Dr. Jackson found that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand, walk, and sit about six hours in an eight-hour workday, R. at 164–65. Additionally, although Plaintiff had some postural limitations, he had no visual, manipulative, communicative, or environmental limitations. *Id*. at 165.

As to Plaintiff's mental RFC, Dr. Jackson determined that Plaintiff had some moderate limitations in understanding and memory, sustained concentration and persistence, and social interactions, but was otherwise able to engage in simple and routine one-step and two-step unskilled vocational activities and remained capable of performing light work. R. at 166–69.

15

On March 5, 2014, Dr. Young-Ja Kim confirmed Dr. Jackson's assessment of Plaintiff's physical and mental RFC, R. at 165, 170. And the disability adjudicator/examiner signed off on the report on March 6, 2014. R. at 170.

On reconsideration, Dr. Russell Taylor made similar physical RFC findings, except that he determined that Plaintiff could stand or walk just two hours in an 8-hour workday (as opposed to the 6 noted by Dr. Jackson). R. at 182. As for the mental RFC, Dr. Taylor, like Dr. Jackson, noted some moderate limitations in understanding and memory, sustained concentration and persistence, and social interactions, but found that Plaintiff retained the mental RFC to "engage in simple and routine unskilled vocational activities of a one and two step requirement." *Id.* at 184–86. Dr. Prasad Kareti confirmed Dr. Taylor's findings on October 23, 2014, R. at 184, 187, and the disability adjudicator/examiner signed off on the report on October 24, 2013, R. at 188.

The ALJ determined, consistent with the above findings, that Plaintiff experienced moderate limitations in social functioning and concentration, persistence, and pace; he also determined that Plaintiff was mildly restricted in his activities of daily living. R. at 27–28. He gave great weight to the March 2014 postural limitation opinions and the findings that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could stand, walk, and sit about six hours in an eight-hour workday, as those opinions were consistent with the medical evidence in the record and the examining sources. R. at 32. Additionally, the ALJ gave "some weight" to the state agency medical consultants' finding that Plaintiff was

16

limited to simple and routine activities but gave no weight to the opinion that he should be limited to one-step and two-step activities. R. at 33. The ALJ explained his decision by noting that Plaintiff "clearly indicated no difficulties with personal care activities, shopping for himself, paying bills, counting change, and handling a savings account. He also reported an interest in reading, and watching television and movies at home, playing checkers, and even sometimes going out without any assistance." R. at 33. The ALJ also observed first-hand that Plaintiff could respond "to all questions" and suffered "no apparent distress during the proceedings that lasted nearly an hour." *Id.* The ALJ also noted that Plaintiff successfully manages his own medication, R. at 27, which is no small task given the number of prescriptions involved.

Plaintiff faults the ALJ for analogizing activities of daily living to work-related tasks. *See* [16] at 12. But even the state agency consultants opined that Plaintiff could perform his past relevant work even with a one-step and two-step limitation. The Court thus finds that the ALJ adequately explained why he elected to give certain portions of the medical consultants' opinions less weight and declines to disturb the ALJ's findings on the bases urged by the Plaintiff.

### C. The ALJ's RFC Findings

After careful consideration of the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not consistent with the record evidence. R. at

29.  The ALJ determined that Plaintiff had the RFC to "perform light work" in that he could; lift up to ten pounds occasionally; stand, walk, or sit for about six hours in an 8-hour workday; and perform simple and routine tasks with occasional interaction with supervisors.  R. at 28.

Plaintiff argues that the ALJ's finding that Plaintiff could perform simple and routine tasks fails to reflect Plaintiff's moderate limits in concentration, persistence, and pace.  [16] at 14.  Not so.

The ALJ indicated that he gave just some weight to the simple and routine task limitation, R. at 33.  He noted that, at his psychiatric evaluation in February 2014, Plaintiff's affect was normal and full in range; his emotional reactions were appropriate; he had no significant perceptual disturbances; his speech production was normal in rate, pace, rhythm, and tone; his stream of conversation was normal and his psychomotor activity was within normal limits; his thought processes were linear, logical, and goal-directed; he had no special preoccupations, no hallucinations, delusions or confusions; on the cognitive portion of the mental status examination, Plaintiff was partially oriented to time and place and fully oriented to person; his immediate memory was intact; his recall memory was slightly affected; his recent and remote memories were intact; his level of knowledge and abstract thinking were fair; and his judgment and insight were good.  R. at 32.  The ALJ also noted the lack of significant mental health evidence in the record, observing that Plaintiff last sought mental health treatment in May of 2013, prior to the alleged onset date.  R. at 29.  And even at that last appointment, Plaintiff's psychiatrist noted that Plaintiff

exhibited good cognition and fair insight and judgment, and he was able to ask important questions about treatment. R. at 31.

Moreover, at the hearing, Plaintiff testified that he experienced drowsiness and insomnia from some of his medications, R. at 67, but, when pressed, he admitted that he never discussed these side effects with his doctors; the only side effect he discussed related to his hepatitis C medication, which made him thirsty, and, for that, his doctor told him to eat candy.[4] R. at 68–69. The admission undermines any claim that such issues limited his ability to function and further supports the ALJ's RFC findings.

### D. The ALJ's Evaluation of Plaintiff's Subjective Pain Allegations

Finally, Plaintiff argues that the ALJ erred in discounting Plaintiff's subjective allegations of pain. Initially, this Court gives special deference to an ALJ's credibility findings; such findings are overturned only if "patently wrong." *Summers v. Berryhill,* 864 F.3d 523, 528 (7th Cir. 2017) (quoting *Eichstadt v. Astrue*, 534 F.3d 663, 667–68 (7th Cir. 2008)); *see also Matthews v. Saul,* 833 Fed. App'x 432, 437 (7th Cir. 2020) (finding even where the Commissioner conceded the record could be read differently, the ALJ's partially adverse credibility finding was not "patently wrong" and "substantial evidence" supported his conclusion that the plaintiff's complaints "were not entirely consistent with the record."). A decision is "patently wrong" when it lacks any explanation or support. *Elder*, 529 F.3d at 413–14.

---

[4] Plaintiff also testified that his hepatitis C resolved before the hearing. R. at 72.

Here, the ALJ properly examined the numerous inconsistences between Plaintiff's reported symptoms and the record. Although Plaintiff complained of right foot and lower back pain, his ambulation was most often normal. R. at 29. Plaintiff also stated he needed to elevate his legs three to four times daily, but no medical provider ever mentioned this; nor do the treatment notes support the restriction. *Id.* And the record included little in the way of mental health evidence, as Plaintiff did not seek any mental health treatment after his alleged onset date. R. at 31. The ALJ also correctly noted that no medical provider ever prescribed the use of a cane.[5] R. at 29. He also highlighted Plaintiff's exaggerations concerning the structure and frequency of his treatment with Dr. Monterubianesi, and his noted tendency to give limited effort on examination. R. at 30–31. The ALJ noted that Plaintiff, in fact, moved about for pain relief, which suggests that he was not so limited in his movement, and the ALJ also noted the numerous references in the medical records demonstrating that pain medications helped relieve Plaintiff's pain. R. at 31. Finally, the ALJ observed that Plaintiff did not appear in any distress during the almost hour-long hearing, during which he remained seated. R. at 33.

Based upon the record, the Court cannot say that the ALJ's credibility findings were patently wrong. Indeed, the decision to discount Plaintiff's pain allegations finds ample support in the record, as discussed above.

---

[5] As Plaintiff correctly notes, although the ALJ stated that no medical examiner noted the use of the cane, in fact Dr. Youkhana had noted the use of the cane, though it was not prescribed. In contrast to *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), however, nothing in the record here shows that *anyone* suggested the use of a cane—not a doctor, not an occupational therapist, no one.

V.    **Conclusion**

For the reasons explained above, the Court finds that the ALJ's decision rests upon substantial evidence.  Accordingly, the Court grants Defendant's motion for summary judgment [28], denies Plaintiff's motion for reversal [16], and affirms the Commissioner's decision to deny benefits.

Dated: May 27, 2022                    Entered:

                                        John Robert Blakey
                                        United States District Judge